**DEPARTMENT OF CORRECTIONS,**
**Petitioner**

v.

**PENNSYLVANIA STATE CORREC-**
**TIONS OFFICERS ASSOCIA-**
**TION, Respondent.**

Commonwealth Court of Pennsylvania.

Argued April 9, 2007.
Decided May 3, 2007.

---

Frank A. Fisher, Chief Counsel, Harrisburg, for petitioner.

Marc L. Gelman, Philadelphia, for respondent.

BEFORE: LEADBETTER, President Judge, LEAVITT, Judge (P.), FLAHERTY, Senior Judge.

OPINION BY Judge LEAVITT.

The Department of Corrections (Department) petitions this Court to review a labor arbitration award rendered pursuant to a collective bargaining agreement and the Public Employe Relations Act (Act 195).[1] The arbitrator converted the Department's discharge of Corrections Officer Joseph Karpinsky into a five-day suspension, concluding that Karpinsky's off-duty misconduct did not constitute just cause for termination. In this case we consider whether the arbitration award draws its essence from the collective bargaining agreement and whether Karpinsky's conduct impaired or threatened the Department's core functions.

The relevant facts as found by the arbitrator are as follows.[2] Joseph Karpinsky is a Corrections Officer 2 assigned to the State Correctional Institution in Greene County (SCI–Greene) and a member of the Pennsylvania State Corrections Officers

---

1. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.101–1101.2301.

2. There is no formal record of the arbitration proceedings. We shall therefore assume that the evidence presented is as recounted in the arbitrator's award. *Matter of Arbitration Between Mount Carmel Borough Police Dept.,* 159 Pa.Cmwlth. 535, 633 A.2d 1301, 1304 n. 9 (1993). We recognize that grievance arbitration procedures are less formal than most administrative proceedings. Nevertheless, we reiterate our admonition in *Mount Carmel Borough* that the parties in these types of proceedings should create and preserve a record in order to facilitate appellate review. *Id.*

Association (Association). At 1:40 a.m. on December 17, 2004, Karpinsky, while off duty, telephoned his friend and co-worker, Sergeant Dan Berthlotte, who was on duty in SCI–Greene's control center. According to Berthlotte,[3] the following exchange took place:

Berthlotte: SCI Greene, [Sergeant] Berthlotte.

Karpinsky: If I do a Bender [4] do you have my back?

Berthlotte: Who is this?

Karpinsky: It's Joe, Dan.

Berthlotte: Joe what are you talking about?

Karpinsky: If I do a Bender do you have my back?

Berthlotte: Joe if you kill someone no I don't have your back.

Karpinsky: Why not?

Berthlotte: Where are you?

Karpinsky: I'm on [State Route] 21 heading to Uniontown. Dan I love you like a brother. I just wanted you to know that. And take care of my daughter.

Berthlotte: Joe, Amy [5] is not going to let me have Asia.

Karpinsky: You're her godfather!

Berthlotte: Joe where are you and what are you talking about?

Karpinsky: It's been going on too long it's time I take care of this shit. I know of eight people and where [they] are. I'm going to take care of them.

Berthlotte: Joe what are you talking about? Are you talking about Amy?

Karpinsky: Yes she is one. Dan I'm not joking. I have my SKS, my shotgun and my .357 with 400 rounds of ammuni-

tion. By the time you get off of work this will be over.

Berthlotte: Joe, don't be like one of these nuts in here.

Karpinsky: Oh I'm not, don't worry about that. I just wanted you to know I love you like a brother and take care of Asia.

Berthlotte: Joe don't do anything stupid.

Karpinsky: Dan I have to go.

Reproduced Record at 238a–239a (R.R. ——). A concerned Berthlotte informed his supervisor about the conversation. The state police were notified and the prison's security officers were instructed to be on alert should Karpinsky attempt to enter the grounds.

Karpinsky also sent a cellular text message to Sergeant Dave LeMasters at 1:57 a.m. which read as follows:

Ur gonna get whats coming 2 U. Better cover Ur tracks well & watch Ur Back. PSP is not going 2 Like what Happens 2 U Marine fag.

R.R. 240a. LeMasters was off duty when Karpinsky sent the text message and did not retrieve it until 9:00 a.m. LeMasters called the sending number and recognized Karpinsky's voice. Karpinsky hung up. LeMasters then called Karpinsky's ex-wife, who informed him that the state police had visited her home that morning to investigate alleged threats by Karpinsky. LeMasters informed prison officials about the text message when he reported for his 2:00 p.m. shift.

The Department suspended Karpinsky on December 17, 2004, pending an investi-

---

**3.** Although this exchange appears as if transcribed, or recorded, it was not. This exchange was drawn from Berthlotte's memory, as reported to his supervisor.

**4.** Sergeant Berthlotte interpreted "Bender" as a reference to a former employee of SCI–Greene who had committed homicide.

**5.** "Amy" is Karpinsky's ex-wife and the mother of his child, Asia.

gation. On December 28, 2004, Karpinsky gave a statement to Captain John Kingston, Intelligence Captain and SCI–Greene's liaison to the Pennsylvania State Police. Karpinsky admitted that he had called Sergeant Berthlotte at SCI–Greene but he denied the content of the conversation as reported by Berthlotte. Karpinsky admitted that he sent the text message to Sergeant LeMasters, but claimed that it was in response to a message he received from LeMasters. In his statement, Berthlotte recalled that Karpinsky was crying on the phone and may have been intoxicated. Berthlotte stated that Karpinsky did not threaten him or any other prison employees. Based upon his personal relationship with Karpinsky, Berthlotte felt that he might have been "blowing off steam."

LeMasters attributed the text message to Karpinsky's mistaken belief that he was having an affair with Karpinsky's ex-wife. LeMasters stated that he had minimal contact with Karpinsky prior to December 17, 2004. He did not feel physically threatened by Karpinsky, but worried that further antagonism with Karpinsky could jeopardize his employment.

A preliminary disciplinary conference was conducted on January 12, 2005, at which time Karpinsky admitted that he called Sergeant Berthlotte but denied that he said he was going to "do a Bender" or that he had composed a list of eight people to "take care of." Karpinsky admitted sending the text message to Sergeant LeMasters but said that it had been misconstrued.

Karpinsky was terminated on January 27, 2005. His termination letter stated that the Department had just cause to discharge Karpinsky based upon his conversation with Berthlotte, the text message he sent to LeMasters, and his untruthfulness during the investigation and at the preliminary disciplinary conference. Specifically, the Department charged Karpinsky with violating the following provisions of the Department's Code of Ethics:

B–10 Employees are expected to treat their peers, supervisors and the general public with respect and conduct themselves properly and professionally at all times; unacceptable conduct or insolence will not be tolerated.

B–23 During off-duty hours, employees will conduct themselves in such a manner so as to demonstrate the public's trust and confidence inherent in their position as a public servant. Any conduct which brings discredit to their profession, responsibilities, the Department of Corrections, or public service at large shall be subject to immediate discipline.

B–29 All employees shall comply and cooperate with internal investigations conducted under the authority of the Department of Corrections, and respond to questions completely and truthfully. Procedure in cases that may result in criminal prosecution will include those rights accorded to all citizens of the Commonwealth.

Arbitration Opinion and Award at 1; R.R. 395a.[6] The Department also charged Karpinsky with violating Section 11 of Department Policy 4.1.1 pertaining to workplace violence.[7]

On January 31, 2005, the Association filed a grievance alleging that the Department violated the collective bargaining

---

**6.** Karpinsky acknowledged receiving a copy of the Code of Ethics on November 4, 1995.

**7.** Section 11 of Department Policy 4.1.1 contains no substantive provisions. It describes the requirements and procedures for report-ing incidents of workplace violence. R.R. 283a–289a. An attachment to the policy describes several "examples of workplace violence." One such example is when "[a]n employee receives threats and/or harassment by e-mail." R.R. 289a.

agreement when it terminated Karpinsky without just cause. The Association alleged, specifically, that the Department failed to use progressive discipline, disparately treated its employees and that termination was too severe for Karpinsky's misconduct.

The parties were unable to resolve the matter through the grievance procedure contained in the collective bargaining agreement. As a result, the dispute was submitted to arbitration in accordance with Section 903 of Act 195, 43 P.S. § 1101.903,[8] and Article 35 of the collective bargaining agreement. A hearing was held on May 10, 2006, before an arbitrator mutually selected by the Department and the Association. The arbitrator issued his opinion and award on October 17, 2006.

The arbitrator found that there was a "nexus" between Karpinsky's off-duty conduct and the workplace since he called Sergeant Berthlotte while Berthlotte was on duty and sent a text message to a coworker. The arbitrator further found that the Department had just cause to discipline Karpinsky for making inappropriate statements in violation of the Department's Code of Ethics and workplace violence policy. The arbitrator concluded, however, that termination was not an appropriate penalty for the following reasons:

> In my opinion, [Karpinsky's] conduct of calling in to the facility to discuss violent actions he thought to take does not rise

to the level to substantiate his termination because no evidence was produced to establish [Karpinsky] was involved in a violent activity or that his actions had a significant adverse effect on the Department of Corrections. While I am certainly not condoning the inappropriate conduct of [Karpinsky] on the day in question, his actions have not resulted in any specific harm to the Department of Corrections which has demonstrated the public's trust and confidence in the Department of Corrections has been lessened.

Arbitration Opinion and Award at 24; R.R. 418a. The arbitrator reduced Karpinsky's discipline to a five-day suspension and ordered him to submit to a fitness for duty evaluation by a licensed psychiatrist before returning to work. The present petition for review by the Department followed.

Before this Court, the Department argues that the arbitrator's award must be vacated. The Department asserts that it never bargained away its ability to terminate a corrections officer for the type of conduct exhibited by Karpinsky, which, if left unchecked, could impair the Department's ability to discharge its core function of maintaining safe and secure correctional facilities for both inmates and employees.[9] The Department contends that Karpinsky's threats of violence interfered with that core function by distracting prison officials from their primary duties. The Association counters that there was no

---

8. It provides, in pertinent part:
   Arbitration of disputes or grievances arising out of the interpretation of the provisions of a collective bargaining agreement is mandatory. The procedure to be adopted is a proper subject of bargaining with the proviso that the final step shall provide for a binding decision by an arbitrator or a tripartite board of arbitrators as the parties may agree. Any decisions of the arbitrator or arbitrators requiring legislation will only be effective if such legislation is enacted.

43 P.S. § 1101.903.

9. The Department's stated mission is to "protect the public by confining persons committed to our custody in safe, secure facilities, and to provide opportunities for inmates to acquire the skills and values necessary to become productive law-abiding citizens; while respecting the rights of crime victims." R.R. 228a.

connection between Karpinsky's conduct and his employment relationship with the Department, and, in any event, his actions did not have a direct or indirect negative impact on the Department's core functions.

■ We begin with our narrow standard of review of a grievance arbitration award under Act 195. The Pennsylvania Supreme Court has held that a reviewing court must accord great deference to the award of an arbitrator chosen by the parties. *State System of Higher Education (Cheyney University) v. State College University Professional Association (PSEA–NEA)*, 560 Pa. 135, 149, 743 A.2d 405, 413 (1999). Thus, in the vast majority of cases, the decision of the arbitrator is final and binding upon the parties. *Id.* at 149–150, 743 A.2d at 413. However, there exists an exception to this finality doctrine: The arbitrator's award must "draw its essence from the collective bargaining agreement." *Id.* at 150, 743 A.2d at 413.

■ Pursuant to the so-called "essence test," a reviewing court must conduct a two-prong analysis:

First, the court shall determine if the issue as properly defined is within the terms of the collective bargaining agreement. Second, if the issue is embraced by the agreement, and thus, appropriately before the arbitrator, the arbitrator's award will be upheld if the arbitrator's interpretation can rationally be derived from the collective bargaining agreement. That is to say, a court will only vacate an arbitrator's award where the award indisputably and genuinely is without foundation in, or fails to logically flow from, the collective bargaining agreement.

*Id.* Where a governmental employee has been discharged for "just cause" and that term is undefined in the collective bargaining agreement, the arbitrator has the authority to "interpret the terms of the agreement, including the undefined term 'just cause' and to determine whether there was just cause for discharge …". *Office of Attorney General v. Council 13, American Federation of State, County, & Municipal Employees, AFL–CIO*, 577 Pa. 257, 269, 844 A.2d 1217, 1224 (2004).

■ The usual deference to be accorded an arbitrator's award is not without exception. Our Supreme Court has held that deference to an arbitrator is tempered where the arbitrator's interpretation of the collective bargaining agreement led to the governmental employer relinquishing essential control over the public enterprise, *i.e.*, those powers essential to its ability to discharge its various functions. *Id.* at 272, 844 A.2d at 1226. The theory behind this "core function" doctrine is that

a government employer cannot bargain away its power to fire for misconduct bearing directly upon the performance of its essential functions; this incapacity (referred to as contractual incapacity) imposes a legal restriction on an arbitrator's interpretation as to what the parties meant by "just cause."

*Philadelphia Housing Authority v. American Federation of State, County and Municipal Employees, District Council 33, Local 934*, 900 A.2d 1043, 1046 (Pa. Cmwlth.2006).

In *Philadelphia Housing Authority*, this Court conducted an exhaustive review of the "core function" doctrine and the circumstances which will trigger its applicability. We announced the following multipart test for determining whether a "core function" is or is not implicated in cases involving discipline of government employees:

First, where serious misconduct is of a sort which has a *direct* negative impact on the public function of the employing agency, such as preying upon or otherwise putting at risk those persons the agency is charged to serve, there is no

question that the core function test has been satisfied. On the other hand, where the conduct is of a type which will have only an *indirect* or *potential* impact on the agency's public duties, such as embezzlement or a breach of trust, two conditions must be met. The misconduct must be work-related *and* must involve dishonesty or other misconduct so egregious that if the agency is unable to curtail such behavior it risks relinquishing control of the orderly functioning of its operations.... [I]t is not necessary that the particular act(s) of the discharged employee, standing alone, impairs or threatens the agency's operation, but rather that it is the type of conduct which, if left unchecked, may lead to such a result.

*Id.* at 1051 (emphasis in original) (footnotes omitted).

██ With the foregoing principles in mind, we turn to the arbitrator's award in this case. The parties do not dispute that the first prong of the essence test was satisfied. The issue of whether the Department had just cause to terminate Karpinsky falls within Article 26 of the collective bargaining agreement, which provides: "The Employer shall not demote, suspend, discharge or take any disciplinary action against an employee without just cause." R.R. 137a. The parties' disagreement arises over whether the arbitration award, which modified Karpinsky's discharge to a five-day suspension, was rationally derived from the collective bargaining agreement. The Department maintains that it was not because the award caused it to lose essential control over its core function of providing a safe and secure prison for both inmates and staff. We disagree.

Applying the test announced in *Philadelphia Housing Authority,* we consider, first, whether Karpinsky's misconduct had a "direct negative impact" on the public function of the Department. The Depart-

ment argues that it did, and in support cites the arbitrator's determination that Karpinsky's act of calling Sergeant Berthlotte while Berthlotte was on duty established a "nexus" between his conduct and his employment. As further support, the Department asserts that SCI–Greene's security officers were directed to notify prison officials if Karpinsky entered the grounds, thus distracting them from their official duties.

The Department misconstrues the arbitrator's "nexus" language. While it is true that the arbitrator concluded that Karpinsky "became involved with the workplace" and that his actions "had an impact on the workplace," these observations were offered to establish just cause for imposing *some* level of discipline on Karpinsky. The salient portion of the arbitrator's award states that

[Karpinsky's] conduct of calling in to the facility to discuss violent actions he thought to take does not rise to the level to substantiate his termination because *no evidence was produced to establish [Karpinsky] was involved in a violent activity or that his actions had a significant adverse effect on the Department of Corrections.*

Arbitration Opinion and Award at 24; R.R. 418a (emphasis added). The arbitrator's conclusion is supported by the record. Karpinsky was off duty when he placed the call to Sergeant Berthlotte and when he sent the text message to Sergeant LeMasters. Neither Berthlotte nor LeMasters felt directly threatened by Karpinsky's communications. More importantly, Karpinsky's misconduct was not directed toward his employer, nor did it have any impact on the inmates the Department is charged to supervise and protect. There was, as the arbitrator found, no direct negative impact on the Department's public function.

■ We consider, next, whether Karpinsky's conduct had an indirect or potential impact on the Department's core function. This part of the core function analysis has two elements: the misconduct must be (1) work-related and (2) involve dishonesty or other misconduct so egregious that if the agency is unable to curtail such behavior it risks relinquishing control of the orderly functioning of its operations. *Philadelphia Housing Authority*, 900 A.2d at 1051. Regarding the first element, the Association argues that Karpinsky's conduct was in no way related to his work as a corrections officer. The Department maintains that Karpinsky's conduct was work-related and directs us to the arbitrator's discussion of the "nexus" between Karpinsky's actions and the workplace. We agree with the Department's characterization of the arbitrator's award on this issue since the arbitrator ultimately concluded that Karpinsky's conduct was sufficiently related to the workplace to provide the Department with just cause under the collective bargaining agreement to impose some level of discipline.

The real issue in this case is whether Karpinsky's "misconduct [was] so egregious that if the agency is unable to curtail such behavior it risks relinquishing control of the orderly functioning of its operations." *Id.* In making this assessment, this Court has determined that "it is not necessary that the particular act(s) of the discharged employee, standing alone, impairs or threatens the agency's operation, but rather that it is the type of conduct which, if left unchecked, may lead to such a result." *Id.* The Department interprets this standard to mean that in order to maintain a safe and secure correctional facility it must be able to terminate a corrections officer who makes threats of violence, even when off-duty. The Department asks us to reject the arbitrator's conclusion that Karpinsky's discharge from service was not warranted for the

stated reason that he did not actually carry out his threats of violence.

The problem with the Department's position is that Karpinsky's abstention from committing any violent acts was only one factor in the arbitrator's decision. Karpinsky was terminated for off-duty misconduct under Section B–23 of the Department's Code of Ethics, which provides for immediate discipline when an employee's off-duty conduct "brings discredit to [his] profession, responsibilities, the Department of Corrections, or public service at large." Arbitration Opinion and Award at 1; R.R. 395a. To this end, the arbitrator found no evidence that Karpinsky discredited his position or breached the public's trust and confidence in corrections officers at SCI–Greene. The arbitrator noted that the only individuals outside of the prison who were aware of the incident were the state police, mental health professionals and Karpinsky's ex-wife. We defer to these conclusions of the arbitrator, which are supported by the record.

The Department also depreciates the inchoate nature of Karpinsky's misconduct, instead emphasizing that it must act swiftly to thwart any potential threat to the safety of its employees or inmates. This is certainly true. However, this Court has explained that for conduct to have an "indirect or potential impact" on a core function, it must be a type of conduct which, if left unchecked, could impair or threaten the Department's operations. *Philadelphia Housing Authority*, 900 A.2d at 1051. It would be highly speculative for this Court to conclude that Karpinsky's act of calling Sergeant Berthlotte to discuss violent actions Karpinsky was contemplating rose to that level. The conversation was personal in nature, between two co-workers who are close friends, while one of them happened to be at work. Karpinsky did not directly threaten any prison em-

ployee or inmate, and Sergeant Berthlotte stated that he did not feel threatened by the call. Similarly, Sergeant LeMasters stated that he did not feel directly threatened by Karpinsky's text message. That communication from one off-duty employee to another off-duty employee has an even more attenuated connection to the Department's operations than did the telephone call.[10]

In sum, the arbitrator's interpretation of what constitutes "just cause" for termination was rationally derived from the terms of the collective bargaining agreement and the off-duty misconduct provisions in the Department's Code of Ethics. The arbitrator's award did not lead to the Department relinquishing essential control over its ability to discharge its core function. Accordingly, this Court affirms the arbitration award.

### ORDER

AND NOW, this 3rd day of May, 2007, the Award of the American Arbitration Association in the above-captioned matter, dated October 17, 2006, is hereby AFFIRMED.

---

**10.** We note that the Department also raises two "public policy" arguments against the arbitration award. First, the Department analogizes its Code of Ethics to the Governor's Code of Conduct, which this Court has held may be unilaterally implemented by a Commonwealth employer because, *inter alia,* it enhances the public's perception of the integrity of public officials. *Council 13, American Federation of State, County and Municipal Employees, AFL–CIO v. Pennsylvania Labor Relations Board,* 84 Pa.Cmwlth. 458, 479 A.2d 683 (1984). Second, the Department cites cases arising under the Civil Service Act, Act of August 5, 1941, P.L. 752, *as amended,* 71 P.S. §§ 741.1–741.1005, for the proposition that government officials must have broad discretion to remove employees for misconduct that will undermine public confidence in the agency's mission. These policy arguments do not advance the Department's position because they are premised on the notion that Karpinsky's conduct somehow discredited the public's perception of the Department or public service at large. The arbitrator found no such adverse effect and, for the reasons set forth above, this Court agrees.