IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh, Pennsylvania,    :
                Appellant    :
                              :
           v.               :    No. 263 C.D. 2024
                              :    Argued:  February 4, 2025
Fraternal Order of Police, Fort Pitt    :
Lodge No. 1 (Thomas Potts, Grievant)    :

BEFORE:    HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE STACY WALLACE, Judge (P.)
                 HONORABLE MATTHEW S. WOLF, Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER        FILED:  March 17, 2025

The City of Pittsburgh (City) appeals from the February 15, 2024 Order of the Court of Common Pleas of Allegheny County (trial court) denying the City's statutory appeal and affirming the July 31, 2023 Decision and Award (Award) of an arbitration panel in favor of Officer Thomas Potts (Grievant) pursuant to the Policemen and Firemen Collective Bargaining Act, Act of June 24, 1968, P.L. 237, No. 111, *as amended*, 43 P.S. §§ 217.1-217.12, commonly known as Act 111.[1]

As discussed more fully below, we conclude that Act 111 does not require that an arbitrator affix a handwritten signature to an award, nor does it require that the signatures of all members of an arbitration panel appear on the same page of an

---

[1] Section 1 of Act 111 provides:

> Police or firemen employed by a political subdivision of the Commonwealth or by the Commonwealth shall . . . have the right to bargain collectively with their public employers concerning the terms and conditions of their employment, including compensation, hours, working conditions, retirement, pensions and other benefits, and shall have the right to an adjustment or settlement of their grievances or disputes in accordance with the terms of [Act 111].

43 P.S. § 217.1.

award. We also conclude that the substantial evidence standard in Section 754(b) of the Local Agency Law, 42 Pa.C.S. § 754(b), is inapplicable where an employee who is protected by a collective bargaining agreement (CBA) elects to grieve a disciplinary dispute thereunder. Finally, we conclude that because the CBA in this case does not define "just cause," the arbitrators had jurisdiction to interpret "just cause" and did not exceed their authority in reducing Grievant's discipline. Accordingly, we affirm the trial court's Order.

## I. **Background**

Fraternal Order of Police, Fort Pitt Lodge No. 1 (Union), is the exclusive bargaining representative of all police officers in the City's Bureau of Police (Bureau) below the rank of Commander. The City and the Union are parties to a CBA governing the terms and conditions of employment of Bureau officers, including Grievant. The CBA at issue in this appeal was in place from January 1, 2019, to December 31, 2022. (Reproduced Record (R.R.) at 221a.)

The facts concerning Grievant's infraction are largely undisputed. During morning roll call on October 28, 2022, at approximately 6:30 a.m., Sergeant Michael Burford ordered Grievant and his partner, Officer Dalton Dailey, to report to a funeral detail due to concerns of retaliation in response to a gang-related shooting that occurred two weeks earlier. The funeral service was for one of the victims of that shooting and was scheduled to take place at 11:00 a.m. at a church on Brighton Road in the City. Before the roll call was complete, Grievant and Officer Dailey left the station to respond to a robbery in progress because they were the only two-officer car on the shift and such calls are normally handled by two-officer cars. Thereafter,

2

Grievant and Officer Dailey continued patrolling their assigned zone and responded to at least one other service call.[2]

Just before 10:00 a.m., Grievant and Officer Dailey drove to a uniform store on Neville Island, which is located a few miles outside of the City, to pick up uniform pants. Grievant did not request permission to drive to the uniform store that morning, nor did he inform a supervisor or dispatch that he and Officer Dailey were leaving the City.[3] While Grievant and Officer Dailey were en route to the uniform store, Sergeant Burford radioed Officer Dailey and asked him to return to the station to complete some paperwork. Grievant asked Sergeant Burford if their return was related to the funeral detail, and Sergeant Burford responded that it was not.

---

[2] At the arbitration hearing, the parties presented conflicting evidence regarding Sergeant Burford's directives to Grievant and Officer Dailey about the funeral detail. The arbitrators summarized this evidence as follows:

> The time, apparently [11:00 a.m.], and the address of a church at which [Grievant and Officer Dailey] were to report, was given to them by [Sergeant] Burford with advice that more details about the assignment would be forthcoming. No such further details were provided to the officers. In a report made that same day to Acting Chief [of Police Thomas] Stangrecki, [Grievant] claimed [Sergeant] Burford had said he thought the reporting time for the detail [w]as [10:00 a.m.] but would get back to him and Officer Dailey. [Sergeant] Burford has maintained the time was given as [11:00 a.m.] Both [Grievant] and Officer Dailey claim the time [Sergeant] Burford gave them was [10:00 a.m.] Other officers attending the same roll call submitted written statements that the time was given as [11:00 a.m.] or in one case [11:00 or 11:30 a.m.], and other officers did not recall or hear the time. [Sergeant] Burford has maintained the time was [11:00 a.m.]

(R.R. at 61a (internal citations omitted); *see id.* at 320a-27a.)

[3] Grievant testified that he had received Sergeant Burford's permission to drive to the uniform store that day. Sergeant Burford testified that Grievant had requested permission **the day before** and that he denied Grievant's request at that time due to manpower and call volume. Sergeant Burford testified that he told Grievant that he could possibly go to the uniform store the following day, October 28, 2022, but that if he went, he would need to do so early in his shift "when things were expected to be quiet." (R.R. at 61a.)

3

Grievant and Officer Dailey returned to the station between 10:30 a.m. and 11:00 a.m. Grievant was not given any assignments while at the station, but he waited there while Officer Dailey completed the requested paperwork. The funeral assignment was neither mentioned nor discussed during that time period.

Grievant and Officer Dailey did not report to the funeral detail. After the funeral service, at 12:03 p.m., two gunmen opened fire on a crowd of attendees standing outside the church, wounding five people.[4] Video surveillance showed that the gunmen had canvassed the area around the church for 30-45 minutes before the shooting.

Following an internal investigation, on November 10, 2022, the City issued a Disciplinary Action Report to Grievant, citing six violations of the Bureau's rules of conduct and recommending that he be suspended pending termination. Grievant was charged with the following violations: failure to notify dispatch; conduct unbecoming a member; insubordination; neglect of duty; leaving the City while on duty; and lack of truthfulness.

After a hearing, the City imposed a five-day suspension for Grievant's failure to report to the funeral assignment.[5] The Union filed a grievance, which proceeded to arbitration. The arbitration panel was comprised of one neutral arbitrator, Ralph Colflesh, and two partial arbitrators: Matthew Lackner, selected by the City, and Robert Swartzwelder, selected by the Union.

---

[4] The officers were notified of the shooting via a "ShotSpotter" alert received at the police station at 12:03 p.m. on October 28, 2022. "ShotSpotter" is a type of technology that immediately notifies the police station when gunshots are fired in the City, how many shots were fired, and the precise location where the shots were fired. (R.R. at 110a, 331a.)

[5] Grievant, whom the City hired on December 5, 2016, had no disciplinary record before this incident. (R.R. at 60a.)

4

On July 31, 2023, following a bifurcated, two-day hearing, the arbitrators issued an Award in Grievant's favor, reducing his suspension to an oral reprimand and directing that he "be made whole for all lost wages incurred as a result of his suspension." (R.R. at 57a.) On August 4, 2023, Arbitrator Colflesh, the neutral arbitrator, issued an "Award and Supporting Opinion of Majority Arbitrators" (Majority Opinion) on behalf of himself and Arbitrator Swartzwelder, the Union's arbitrator. Arbitrator Lackner, the City's arbitrator, dissented but did not write a separate opinion. (*Id.* at 57a-58a.)

In his Majority Opinion, Arbitrator Colflesh reviewed the six charges against Grievant and determined that the only "viable and relevant" charges, based on the evidence presented at the hearing, were conduct unbecoming a member, insubordination, neglect of duty, lack of truthfulness, and leaving the City while on duty. (*Id.* at 67a.) Arbitrator Colflesh found that the charge of failure to notify dispatch was "inapplicable because it only forbids failure [to notify] of [the] unavailability for duty," which was "absent from the evidence in this matter." (*Id.*)

Regarding the remaining charges against Grievant, Arbitrator Colflesh first found "the truthfulness charge unsustainable because there [was] no evidence [that Grievant] willingly and knowingly lied," noting that it was more likely that Grievant was mistaken about the time of the funeral assignment "given the sketchy nature of [Sergeant] Burford's announcement and the sudden dispatch to the robbery call." (*Id.*) Second, Arbitrator Colflesh concluded that Grievant could not be disciplined for leaving the City while on duty because Sergeant Burford "condoned the . . . officers' trip to the uniform store[,] which [Sergeant Burford] knew was beyond City limits" and because the officers' "journey [to the uniform store] was for police-related purposes . . . to pick up uniform pants." (*Id.*) Third, Arbitrator Colflesh

5

determined that the insubordination charge was unsupported by the evidence because "[Sergeant] Burford . . . either countermanded his order [to attend the funeral detail] and/or condoned [Grievant's] failure to follow it."  (*Id.* at 68a.) Arbitrator Colflesh explained:

> No employer can give an order, have direct and unmistakable knowledge [that] the order is not being carried [out], take no action whatsoever, and then discipline a subordinate for not following it. [Grievant] was in the presence of [Sergeant] Burford for at least some of the time after he returned to the station[,] which overlapped with the funeral assignment by at least an hour and a half.  Yet not once did the Sergeant object.

(*Id.*)

Fourth, Arbitrator Colflesh found sufficient evidence to support the neglect of duty charge, concluding:

> **[Grievant] knew or should have known of the possibility of violence at the funeral of a street gangster who had been killed by rivals and whose funeral would likely be attended by members of his associates.**  The latter could very likely be targets of his enemies.  As the Bureau recognized, it was imperative to have a police presence at the funeral, and **as a member charged with that detail, [Grievant] was negligent, even in light of [Sergeant] Burford's apparent disinterest in having his . . . order fulfilled**[] . . . .
>
> . . . **[Grievant] neglected to act when he knew or should have known a police presence was necessary, had been personally authorized and directed to provide that presence, and was never expressly removed from that responsibility.**  Under those circumstances[,] [Grievant] was duty-bound to at least check the status of the assignment with [Sergeant] Burford or—assuming his involvement in a two-officer unit could be resolved—fulfill the assignment himself.

(*Id.* (emphasis added).)  Lastly, Arbitrator Colflesh found sufficient evidence to support the charge of conduct unbecoming a member for the same reasons.  (*Id.*)

6

Arbitrator Colflesh therefore concluded that, in light of the above findings, "including the exculpations determined by a majority of the arbitrators, a majority of the [p]anel finds the penalty imposed on [Grievant] should be mitigated to an oral reprimand, and [Grievant] made whole for the five-day[] suspension previously imposed." (*Id.* at 69a.)

On August 30, 2023, the City filed a statutory appeal with the trial court seeking to vacate the Award. The City argued that the arbitrators exceeded their jurisdiction and powers by modifying the City's disciplinary penalty and ignoring the parties' agreed-upon standard for just cause in the CBA. The CBA incorporates the disciplinary provisions of the Policemen's Civil Service Act (PCSA), Act of August 10, 1951, P.L. 1189, *as amended*, 53 P.S. §§ 23531-23540. Specifically, Section 9.1(a) of the PCSA provides: "No employe in the competitive or non-competitive class in the bureau of police[] . . . shall be removed, discharged, suspended, demoted or placed on probation, **except for just cause which shall not be religious or political**." 53 P.S. § 23539.1(a) (emphasis added).[6]

On February 15, 2024, the trial court denied the City's statutory appeal and affirmed the Award. (R.R. at 22a.) In its subsequent Pennsylvania Rule of Appellate Procedure 1925(a) Opinion, the trial court explained its reasoning as follows:

> [Section 9.1(a) of the PCSA, 53 P.S. § 23539.1(a),] simply provides that discipline may be imposed for just cause, "which shall not be religious or political." An arbitrator has "jurisdiction to adjudicate the class of disputes arising out of a CBA between a public employer and its firefighters or police employees, rationally related to the terms and conditions of their employment." **Here, the issue of officer discipline arises directly out of the CBA, as Section 5(B)(3) [of the CBA] specifically provides that an officer "may elect to grieve any such disciplinary action to arbitration." Therefore, the arbitration panel had the jurisdiction to interpret "just cause" as contemplated**

---

[6] Section 9.1 of the PCSA was added by Section 4 of the Act of March 20, 1990, P.L. 78.

7

**by the CBA and make a factual determination if just cause for the discipline imposed existed** . . . .

(*Id.* at 7a (internal citation omitted) (emphasis added).)

Next, the trial court rejected the City's contention that the trial court was required to review the Award under a substantial evidence standard. Rather, the trial court determined that it was bound by Act 111, "which provide[s] that when an appeal from an arbitration award falls within narrow certiorari and the question involves fact-finding or an interpretation of the CBA, the standard of 'extreme deference' to the arbitrator's award applies." (*Id.* at 8a (citation omitted).)

Finally, the trial court concluded that in reducing the discipline imposed on Grievant, the arbitrators did not improperly substitute their discretion for that of City management. The trial court noted that "[w]hen discipline is grievable pursuant to the parties' CBA, an arbitrator is within his power to reduce the discipline imposed on an officer." (*Id.* at 8a-9a.) Therefore, the trial court concluded that the arbitrators did not exceed their authority. (*Id.* at 9a.)

## II. Issues

Before this Court, the City asserts that the arbitrators' Award is a nullity; the trial court applied the incorrect standard in reviewing the Award; and the arbitrators exceeded their jurisdiction and powers in issuing the Award.[7]

## III. Analysis

"[J]udicial review of any Act 111 arbitration award, whether an interest or grievance award, is limited to narrow certiorari." *City of Pittsburgh v. Fraternal Ord. of Police, Fort Pitt Lodge No. 1*, 111 A.3d 794, 800 (Pa. Cmwlth. 2015). This means that a court may consider only four issues relating to an Act 111 award: (1) the arbitrator's jurisdiction; (2) the regularity of the proceedings; (3) whether the

---

[7] We have re-ordered the City's issues on appeal.

arbitrator exceeded his or her powers; and (4) whether there was a deprivation of constitutional rights. *Pa. State Police v. Pa. State Troopers' Ass'n (Betancourt)*, 656 A.2d 83, 90 (Pa. 1995). If an arbitration award cannot be vacated on one of these bases, then it must be upheld. *Id.* A mere error of law is insufficient to support the reversal of an Act 111 award. *In re Appeal of Upper Providence Police Del. Cnty. Lodge #27 Fraternal Ord. of Police*, 526 A.2d 315, 322 (Pa. 1987). Moreover,

> as long as an arbitrator's award concerns terms and conditions of employment and does not require performance of an illegal act, or one that a party could not do voluntarily, the "authority" prong of narrow certiorari is "generally met." An argument that an arbitrator misinterpreted a CBA is not within the confines of the narrow certiorari review. This Court's scope of review is a "plenary, non-deferential standard where the resolution of the issues turns on a question of law or application of law to undisputed facts."

*Borough of State Coll. v. Borough of State Coll. Police Ass'n*, 303 A.3d 248, 255 (Pa. Cmwlth. 2023) (citations omitted).

### A. Validity of Award

The City first asserts that the Award is a nullity because: (1) Arbitrator Colflesh's signature on the Award is electronically typewritten, as opposed to handwritten; and (2) the signatures of all three panel members do not appear together on the Award. The City points out that Section 19 of the parties' CBA provides that for disciplinary grievances, "[a]rbitration . . . shall be before a tripartite panel" and that the panel's decision "shall be issued in writing." (R.R. at 267a.) Thus, the City contends that the absence of any one of the arbitrator's signatures on the Award renders it a nullity.

We begin by reviewing the applicable statutory and contractual provisions governing the requirements for an arbitration award. Section 7(a) of Act 111 provides in relevant part:

**The determination of the majority of the board of arbitration thus established shall be final** on the issue or issues in dispute and shall be binding upon the public employer and the policemen or firemen involved. **Such determination shall be in writing** and a copy thereof shall be forwarded to both parties to the dispute.

43 P.S. § 217.7(a) (emphasis added).  Further, the parties' CBA in this case states: "**The tripartite [arbitration panel's] decision shall be issued in writing** within ten (10) calendar days of the hearing, and a supporting opinion, if one is requested by either party, shall be issued within thirty (30) calendar days of the close of the record."  (R.R. at 267a (emphasis added).)

The City first asserts that Arbitrator Colflesh's electronic signature on the Award does not satisfy the requirement that the Award be "in writing."  According to the City, the requirement that an award be "in writing" means that only handwritten signatures shall be affixed to the award.  We disagree with this claim.

While both Act 111 and the parties' CBA require that an arbitration award be "in writing," they are silent as to signatures and contain no express mandate that the award be "signed" by the arbitrators, although that is the customary practice in Act 111 matters.  Critically, the City cites no legal precedent, nor have we found any, that holds that an arbitrator must sign an award by hand or that an arbitrator is prohibited from electronically signing an award.

The only case the City cites on this issue is *In re Estate of Kittler*, 303 A.3d 463 (Pa. Super. 2023), which involved the validity of an electronic signature on a will.  *Kittler*, however, is inapposite.  In *Kittler*, the Superior Court held that an electronic signature on a testator's purported will did not meet the requirements for a "signature" under Section 2502 of the Probate, Estates and Fiduciaries Code (Probate Code), 20 Pa.C.S. § 2502.  *Id.* at 467-70.  Because that statute explicitly requires a "signature," which is undefined, the Superior Court addressed the limited

10

question of what constitutes a "signature" in the context of testamentary rights, ultimately concluding that the Probate Code requires a testator to affix a handwritten signature to a will.

We decline to extend *Kittler*'s limited holding, involving the interpretation and application of a specific provision of the Probate Code to a testamentary matter, to an Act 111 arbitration case. Absent any contractual language or legal precedent establishing that an arbitrator is required to affix a handwritten signature to an Act 111 award, we conclude that Arbitrator Colflesh was permitted to electronically sign the Award.[8]

Next, the City asserts that the Award is invalid because the signatures of all three arbitrators do not appear together on the Award. As the trial court explained:

> Two pages with an identical "award" section were part of the . . . [A]ward. One page had the electronic signature of the neutral arbitrator and the signature of the [Union] arbitrator, both dated July 31, 2023[,] and the other page had the electronic signature of the neutral arbitrator and the signature of the City arbitrator, both dated July 31, 2023.

(R.R. at 5a; *see id.* at 57a-58a.) The City contends, however, that the absence of any one of the arbitrator's signatures on the Award renders it a nullity.

In support of its contention, the City relies on *Goeller v. Liberty Mutual Insurance Co.*, 568 A.2d 176 (Pa. 1990). In *Goeller*, the Supreme Court considered the validity of an arbitration award in which the neutral arbitrator was the only member of the tripartite panel to sign the award. The award in that case was governed by Section 7310(a) of the Uniform Arbitration Act (UAA), which provides

---

[8] We note that Pennsylvania courts are permitted to affix electronic signatures to their legal decisions and orders. Specifically, Pennsylvania Rule of Civil Procedure 76 defines "signature" and provides that "when used in reference to documents produced by a court of the Unified Judicial System," the term includes "**a computer[-]generated signature or a signature created, transmitted, received, or stored by electronic means**, by the signer or by someone with the signer's authorization . . . ." Pa.R.Civ.P. 76 (emphasis added).

that "[t]he award of the arbitrators **shall be in writing and signed by the arbitrators joining in the award**." 42 Pa.C.S. § 7310(a) (emphasis added). Applying this language, the Supreme Court held that "it is manifest that a purported award signed by no more than one of the three members of the panel . . . does not comply with the plain wording of the [UAA]" requiring that the award be signed by all arbitrators joining the award. *Goeller*, 568 A.2d at 177. Because the award at issue contained **only** the signature of the neutral arbitrator, it "fail[ed] the formal statutory requirement, [and] failed the requirement of the[ parties'] agreement." Therefore, the Supreme Court concluded that "the award was a nullity." *Id.*

We conclude that *Goeller* is factually distinguishable from this case. Unlike the arbitration award in *Goeller*, the Award in this case bears the signatures of all three panel members and also indicates which arbitrators joined the Award. The record shows that Arbitrator Colflesh authored and signed the Award electronically on July 31, 2023; Arbitrator Swartzwelder signed it by hand on July 31, 2023, and wrote "Concur" beneath his signature; and Arbitrator Lackner signed it by hand on July 31, 2023, and wrote "Dissent" beneath his signature. (R.R. at 57a-58a, 69a.) The trial court determined that the Award was valid because all three arbitrators executed it on July 31, 2023, albeit by different methods, as follows:

> The failure of all three arbitrators' signatures to appear on one page is a simple pitfall of the "e-signature," where one arbitrator sent out an e-signed award and the other two separately printed and signed the award. **All three arbitrators signed off on the award on July 31, 2023[,] and both signature pages were included with the award.**

12

(*Id.* at 6a (emphasis added).)[9]  Under these circumstances, where the Award was signed by all three arbitrators and it is clear which panel members comprised the majority, we conclude that the Award was fully executed by the tripartite panel as required by Act 111 and the CBA, even though the signatures appear on two separate pages.  Therefore, we conclude that the Award is valid and not a nullity.

## B.  Trial Court's Review of Award

The City also asserts that the trial court erred in failing to review the Award pursuant to Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b), which applies to appeals from local agency decisions where a complete record has been made.[10]  According to the City, the parties' CBA incorporates the disciplinary provisions of the PCSA, and a court must review local agency decisions issued under the PCSA in accordance with the Local Agency Law.  The City asserts that under Section 754(b) of the Local Agency Law, the trial court should have vacated the Award because several of the arbitrators' factual findings are unsupported by

---

[9] *Goeller* is also distinguishable because the arbitration award in that case was governed by the UAA, not Act 111.  The UAA, unlike Act 111, includes a requirement that the award be "signed by the arbitrators joining the award."  42 Pa.C.S. § 7310(a).  Another distinction, as our Supreme Court has recognized, is that the UAA embodies the "essence test," rather than the "narrow certiorari" test reserved for review of Act 111 arbitration awards.  *Betancourt*, 656 A.2d at 86.

[10] Section 754(b) of the Local Agency Law provides:

> In the event a full and complete record of the proceedings before the local agency was made, the court shall hear the appeal without a jury on the record certified by the agency.  After hearing the court shall affirm the adjudication unless it shall find that the adjudication is in violation of the constitutional rights of the appellant, or is not in accordance with law, or that the provisions of Subchapter B of Chapter 5 (relating to practice and procedure of local agencies) have been violated in the proceedings before the agency, or that any finding of fact made by the agency and necessary to support its adjudication is not supported by substantial evidence. . . .

2 Pa.C.S. § 754(b).

13

substantial evidence. We conclude, however, that Section 754(b) of the Local Agency Law is inapplicable to this case.

While the Local Agency Law governs appeals from disciplinary decisions for civil service employees **not** protected by a CBA, *see generally Elliott v. City of Pittsburgh*, 638 A.2d 413 (Pa. Cmwlth. 1994), where a civil service employee **is** protected by a CBA, as in this case, the terms of the CBA control. Here, the parties' CBA states that "**the procedure for** appointments, promotions, and reduction of force, **suspensions** and discharges is" governed by the PCSA. (R.R. at 230a (emphasis added).) Section 9.1(a) of the PCSA, in turn, states with respect to employee discipline:

> No employe in the competitive or non-competitive class in the bureau of police, except any such employe who has been convicted of a felony and whose appellate remedies have been exhausted, **shall be removed, discharged, suspended, demoted or placed on probation, except for just cause which shall not be religious or political.**

53 P.S. § 23539.1(a) (emphasis added). The PCSA also provides that "**[t]he procedure for an employe to challenge a** removal, discharge or **suspension** or placement on probation **is subject to collective bargaining**" in accordance with Act 111. *Id.* (emphasis added). In other words, while employee discipline is governed by the "just cause" provision in the PCSA, the procedure for an employee to challenge discipline imposed is governed by the CBA, if one exists.

Here, the parties' CBA provides that a police officer may elect to have any disciplinary dispute reviewed via Act 111 grievance arbitration. (*See* R.R. at 231a ("The employee may elect to grieve any . . . disciplinary action to arbitration before a tripartite arbitration panel selected in accordance with the [p]olice discipline appeals procedures of the contract."), 267a ("Within fourteen (14) calendar days after receipt of the Director [of Public Safety]'s final decision[,] the [p]olice [o]fficer

14

or the [Union] may file a grievance in writing protesting the disciplinary action. The grievance will include a request for arbitration.").) Hence, once a police officer elects to grieve a disciplinary action under the CBA, the appeal provisions of the Local Agency Law no longer apply. *See City of Arnold v. Wage Policy Comm. of City of Arnold Police Dep't*, 171 A.3d 744, 754-57 (Pa. 2017) (holding that the Local Agency Law did not apply where the parties had agreed to submit any disputes arising under the CBA to mandatory grievance arbitration); *Zipovsky v. City of Hazleton Aggregated Pension Bd.*, 326 A.3d 134, 146 (Pa. Cmwlth. 2024) (holding that under the parties' CBA, a police officer's challenge could only be brought through the dispute resolution process set forth in the CBA and, therefore, the Local Agency Law did not apply to the officer's petition challenging the calculation of his pension benefits).

As explained above, because this case involves an Act 111 grievance arbitration award, the trial court's review of the Award was limited to narrow certiorari. Thus, the trial court correctly concluded that it was "bound by Act 111 arbitration standards, which provides that when an appeal from an arbitration award falls within narrow certiorari and the question involves fact-finding or an interpretation of the CBA, the standard of 'extreme deference' to the arbitrator's award applies." (R.R. at 8a (citation omitted)); *see Borough of Montoursville v. Montoursville Police Bargaining Unit*, 958 A.2d 1084, 1089 (Pa. Cmwlth. 2008) ("Because the [a]rbitrator's award was based on the [a]rbitrator's findings of fact and interpretation of disputed contract terms and conditions, our standard of review is one of extreme deference to the [a]rbitrator."). We conclude that the trial court employed the proper legal standard for reviewing the Award in this case. Therefore,

15

the trial court did not err in failing to review the Award under Section 754(b) of the Local Agency Law.[11]

### C. Arbitrators' Jurisdiction and Powers

Finally, the City asserts that the trial court erred in affirming the Award because the arbitrators exceeded their jurisdiction and powers.[12]  Specifically, the City contends that the arbitrators improperly construed the meaning of "just cause" in the CBA without reference to case law interpreting Section 9.1(a) of the PCSA. The City also contends that the arbitrators exceeded their powers by improperly substituting their discretion for that of City management in reducing Grievant's discipline to an oral reprimand.

The question of an arbitrator's jurisdiction "goes to his . . . power to decide an issue in dispute rather than his . . . fashioning of an award." *Bensalem Township v. Bensalem Twp. Police Benevolent Ass'n, Inc.*, 803 A.2d 239, 243 (Pa. Cmwlth. 2002).  "[A]n arbitrator exceeds his jurisdiction only when he addresses issues not submitted to him." *Pa. State Police v. Pa. State Troopers' Ass'n (Keyes)*, 54 A.3d 129, 133 (Pa. Cmwlth. 2012).  However, an arbitrator has wide latitude to address any issues that are properly submitted and "may speak to an issue if it is reasonably subsumed within the issues properly before the arbitration panel." *Michael G. Lutz Lodge No. 5 v. City of Philadelphia*, 129 A.3d 1221, 1231 (Pa. 2015).

Section 9.1(a) of the PCSA, which is incorporated into the parties' CBA, provides that discipline may be imposed on an officer "for just cause which shall not

---

[11] The City devotes a significant portion of its appellate brief to arguing that several of the arbitrators' factual findings are unsupported by substantial evidence under Section 754(b) of the Local Agency Law.  (*See* City's Br. at 31-37.)  Because we conclude that the Local Agency Law is inapplicable here, we need not address the City's challenges in this regard.

[12] Questions relating to the arbitrators' jurisdiction and powers fall within our narrow certiorari review.  *See Betancourt*, 656 A.2d at 90.

16

be religious or political," 53 P.S. § 23539.1(a), but does not provide a more specific definition of "just cause." Notably, while the City repeatedly asserts that the arbitrators erred in failing to reference relevant "legal precedent under the PCSA," the City identifies no such precedent in its brief. (*See* City's Br. at 17-21.) Nor has our research revealed any case law specifically interpreting the "just cause" provision in Section 9.1(a) of the PCSA.[13] Consequently, we cannot fault the arbitrators for failing to reference nonexistent precedent in their decision.

While the parties disagreed about the precise wording of the issues before the arbitrators at the hearing, Arbitrator Colflesh determined that "it is evident in the parties' [post-hearing] briefs that both [parties] agree the disciplinary standard in this case is 'just cause[,]' that is, whether or not the City had just cause to levy the discipline imposed on [Grievant] and if not what the remedy should be." (R.R. at 60a.) As the trial court correctly observed, the arbitrators' determination of whether the discipline imposed on Grievant was for "just cause" required them to interpret the parties' CBA. (*Id.* at 7a.) "Where a governmental employee has been discharged

---

[13] While we have no guidance from our appellate courts specifically regarding Section 9.1(a) of the PCSA, this Court has previously defined "just cause" in the civil service context as follows:

> What constitutes ample [just] cause for removal . . . must necessarily be largely a matter of discretion on the part of the head of the department. To be sufficient, however, the cause should be personal to the employee and such as to render him unfit for the position he occupies, thus making his dismissal justifiable and for the good of the service.
>
> . . . **All that the law requires is that the cause be not religious or political, but concerned solely with the inefficiency, delinquency or misconduct of the employe**. . . .

*Benvignati v. Civ. Serv. Comm'n*, 527 A.2d 1074, 1075 (Pa. Cmwlth. 1987) (quoting *In re O'Gorman*, 187 A.2d 581, 583-84 (Pa. 1963)) (emphasis added).

17

for 'just cause' and that term is undefined in the [CBA], the arbitrator has the authority to 'interpret the terms of the agreement, including the undefined term "just cause" and to determine whether there was just cause for'" the discipline imposed. *Dep't of Corr. v. Pa. State Corr. Officers Ass'n*, 923 A.2d 1212, 1217 (Pa. Cmwlth. 2007) (citation omitted). Therefore, we conclude that the arbitrators had jurisdiction to interpret "just cause" as contemplated by the CBA and to make a factual determination as to whether just cause for Grievant's suspension existed based on the evidence of record.[14]

Finally, we reject the City's contention that the arbitrators exceeded their authority in reducing Grievant's discipline to an oral reprimand. Our Court has stated that an arbitrator does not exceed his authority if the acts he requires of the public employer are legal, relate to the terms and conditions of employment, and are acts that the employer could perform voluntarily. *Keyes*, 54 A.3d at 133. Thus, a reviewing court may not set aside an Act 111 award unless the arbitrator mandated an illegal act or addressed issues beyond the terms and conditions of employment. *Bristol Borough v. Bristol Borough Police Benevolent Ass'n*, 815 A.2d 662, 663 n.3 (Pa. Cmwlth. 2003); *see also* R.R. at 233a ("The Arbitrator shall not have the right to add to, subtract from, modify, or disregard any of the terms or provisions of the [CBA].").

Here, the parties' CBA unequivocally states that "[t]he arbitrator[s] shall fashion a remedy **in their sole discretion**." (R.R. at 268a (emphasis added).) Likewise, our courts have held that when an officer's discipline is grievable under a CBA, an arbitrator is within his or her power to reduce the discipline imposed, so

---

[14] "[U]nder prevailing law, an arbitrator's legal errors in the interpretation of the [CBA] fall outside the scope of appropriate judicial review in the Act 111 context." *City of Pittsburgh v. Fraternal Ord. of Police, Fort Pitt Lodge No. 1*, 224 A.3d 702, 714 n.10 (Pa. 2020).

18

long as the award does require the public employer to perform an illegal act or an act that it could not voluntarily perform. *See N. Berks Reg'l Police Comm'n v. Berks Cnty. Fraternal Ord. of Police, Lodge #71*, 230 A.3d 1022, 1035 (Pa. 2020); *see also City of Philadelphia v. Fraternal Ord. of Police, Lodge No. 5* (Pa. Cmwlth., No. 1243 C.D. 2021, filed June 28, 2023), slip op. at 15 ("[C]ourts have resisted attempts to review Act 111 arbitration awards that mitigate discipline as an excess of authority.").[15]

The propriety of Grievant's suspension was submitted to the arbitrators, and the parties' CBA states that disciplinary matters are grievable under Act 111. (*See* R.R. at 231a, 267a.) The Award issued by the arbitrators was contemplated by the CBA and did not require the City to perform an illegal act or an act that it could not voluntarily perform. In the Majority Opinion, after setting forth his factual findings, Arbitrator Colflesh concluded that although the evidence supported the charges of neglect of duty and conduct unbecoming a member, due to "the exculpations determined by a majority of the arbitrators," Grievant's penalty should be mitigated. (*Id.* at 68a-69a.) We conclude that the arbitrators did not exceed their authority in reducing Grievant's suspension based on the record evidence and their factual findings. *See City of Pittsburgh*, 111 A.3d at 800 ("An arbitrator **does not exceed his authority** if the acts he requires the public employer to do are legal; are acts that the employer could do voluntarily; and relate to the terms and conditions of employment.") (emphasis added).

---

[15] Under Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a), we may cite an unreported memorandum decision of this Court, issued after January 15, 2008, for its persuasive value.

## IV. <u>Conclusion</u>

In sum, we conclude that the Award was valid, the trial court exercised the proper standard of review, and the arbitrators did not exceed their jurisdiction or powers in issuing the Award. Accordingly, we affirm the trial court's Order.

_____
RENÉE COHN JUBELIRER, President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

City of Pittsburgh, Pennsylvania,  :
                         Appellant  :
                           :
              v.  :    No. 263 C.D. 2024
                           :
Fraternal Order of Police, Fort Pitt  :
Lodge No. 1 (Thomas Potts, Grievant)  :

## **O R D E R**

NOW, March 17, 2025, the Order of the Court of Common Pleas of Allegheny County, entered on February 15, 2024, is hereby AFFIRMED.

_____
RENÉE COHN JUBELIRER, President Judge